# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ROCK HILL DIVISION

| | |
|---|---|
| Shaun Nathan Scipio, ) | |
| ) | Civil Action No. 0:17-cv-03126-JMC |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER AND OPINION** |
| ) | |
| Fairfield County, *South Carolina*, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

This action arises from a dispute over Plaintiff Shaun Nathan Scipio's use of a handicapped parking permit while an employee at the Fairfield County Detention Center. Plaintiff alleges that Defendant Fairfield County took adverse employment actions against him – unfavorable work conditions, hostile work environment, reprimands, and harassment – because of his disability. (ECF No. 43 at 1.) The matter before the court is a review of the Magistrate Judge's Report and Recommendation ("Report") issued on May 15, 2019, recommending that the court grant Defendant's Motion for Summary Judgment. (*Id.* at 21.)

For the reasons below, the court **ACCEPTS** the Report and Recommendation (ECF No. 41) and **GRANTS** Defendant Fairfield County, South Carolina's Motion for Summary Judgment (ECF No. 24).

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Report sets forth the relevant facts and legal standards, which this court incorporates herein without a full recitation. In December 2013, Plaintiff was diagnosed with congestive heart failure. (ECF No. 41 at 1.) Defendant Fairfield County hired Plaintiff as a corrections officer at the Fairfield County Detention Center on November 23, 2015. (*Id.* at 2.) Plaintiff passed the physical examination required to work as a corrections officer. (*Id.*) However, Plaintiff suffered health

issues that caused him to leave shifts early or to be medically excused from work by his physician. (*Id.* at 2-4.) On May 10, 2016, Plaintiff received a letter about his ten absences from work, recognizing that he had experienced "some health problems," informing him he did not have any more time off, and instructing him to have the Fairfield County doctor complete a "fit-for-duty slip" before returning to work. (*Id.* at 4.) On May 16, 2016, Plaintiff was admitted to the hospital for three days and underwent heart catheterization, an angiogram, and a transthoracic echocardiogram. (*Id.* at 5.) Plaintiff was diagnosed with severe systemic disease with functional limitation, and his doctor allowed him to return to work on May 19, 2016 (*Id.* at 6.) On May 20, 2016, Plaintiff met with Human Resources to discuss his absences and request leave due to the death of his sister. (*Id.*) Human Resources granted the request and asked Plaintiff to provide doctors' excuses for the time he missed due to his health condition, an obituary or funeral bulletin, and a completed fit-for-duty form by his next shift assignment on Thursday, May 26, 2016. (*Id.*)

On May 23, 2016, Plaintiff returned to the emergency department with complaints of nausea, vomiting, dizziness, and rapid heartbeat. (*Id.*) On May 26, 2016, Plaintiff arrived for work and parked in the handicap parking space at the Detention Center (*Id.* at 7.) Lt. Gray, the shift supervisor, told Plaintiff he could not return to work without his fit-for-duty paperwork, that reporting for work suggested he was fully capable of performing his job, and that he could not park in the handicap parking space. (*Id.* at 7.) Plaintiff explained that he had a handicap placard due to certain physical impairments and that he had an appointment with his heart doctor. (*Id.*) Human Resources requested that he submit another fit-for-duty form signed by the cardiologist. (*Id.*) The cardiologist cleared Plaintiff for work without restrictions. (*Id.* at 9.)

On June 13, 2016, Plaintiff returned to work and was presented with a memorandum from Davis instructing that, because his doctors had cleared him for work without restrictions, he should

2

not park in the handicap space. Moreover, Plaintiff was placed on a six-month probationary period and monitored under a performance review plan. (*Id.*) On June 14, 2016, Plaintiff submitted his letter of resignation. (*Id.* at 10.)

On October 13, 2017, Plaintiff filed a Complaint in the Fairfield County Court of Common Pleas, alleging (1) disability discrimination; (2) failure to provide a reasonable accommodation; and (3) retaliation pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 (2009). (ECF No. 1-1 at 5-8 ¶¶ 25-42.) The ADA protects a "qualified individual" by prohibiting a covered entity[1] from taking adverse employment actions because of a person's disability. *See* 42 U.S.C. § 12112(a) (2009).[2]

On November 16, 2017, Defendant filed a Notice of Removal. (ECF No. 1.) On December 31, 2018, Defendant filed a Motion for Summary Judgment, declaring that Plaintiff failed to establish a *prima facie* case of disparate treatment due to disability or retaliation. (ECF No. 24-1 at 33.) Furthermore, Defendant avers that none of the alleged employment actions demonstrate pretext for unlawful discrimination. (*Id*.) Plaintiff filed a Response in Opposition on February 4, 2019, to which Defendant filed a Reply on February 11, 2019. (ECF Nos. 34, 36.) The Magistrate Judge concluded that Plaintiff failed to show a genuine issue of material fact regarding his status as a qualified individual under the ADA and as such "summary judgment is appropriate on all claims." (ECF No. 41 at 21.) Plaintiff timely filed objections to the Report on May 28, 2019, and Defendant filed a Reply on June 3, 2019. (ECF Nos. 43, 45.) The court held oral arguments on

---

[1] "A 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111 (2009).
[2] "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

June 26, 2019. (ECF No. 48.)

## II. LEGAL STANDARD

The Magistrate Judge's Report is made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 for the District of South Carolina. The Magistrate Judge only makes a recommendation to this court, and the recommendation has no presumptive weight. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The responsibility to make a final determination remains with the court. *Id.* at 271. As such, the court is charged with making *de novo* determinations of those portions of the Report to which specific objections are made. *See* 28 U.S.C. § 636(b)(1); *See also* Fed. R. Civ. P. 72(b)(3). In the absence of specific objections to the Magistrate Judge's Report, the court is not required to give any explanation for adopting the Report. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). Rather, "in the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note). Thus, the court may accept, reject, or modify, in whole or in part, the Magistrate Judge's recommendation or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds a reasonable jury could return a verdict for the non-moving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011). When ruling on a summary

judgment motion, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). The non-moving party may not oppose a summary judgment motion with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(c) (1); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 256; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required to survive summary judgment is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

### III. ANALYSIS

Plaintiff objects to the Report and argues that the Magistrate Judge erred in finding that: (1) Plaintiff failed to create a genuine issue of material fact as to whether he is a "qualified individual" under the ADA; (2) Plaintiff failed to sufficiently explain his contradicting SSDI application and ADA claim; and (3) Defendant Fairfield County did not admit that Plaintiff could perform the essential functions of a corrections officer. (ECF No. 43 at 4-13.)

A. Plaintiff's First Objection

Plaintiff asserts that he is a qualified individual under the ADA and that a reasonable jury may well conclude that, "absent Defendant [Fairfield County's] discriminatory treatment and failure to provide a reasonable accommodation, Plaintiff would have performed the essential functions of his job and could have continued to work as [a corrections officer]." (ECF No. 43 at 5.) The Magistrate Judge concluded that Plaintiff's allegations do not "explain or even address how, in light of his assertions of disability, he was, in fact, qualified to perform the essential

5

functions of the position." (ECF No. 41 at 21 (citing *Lane v. BFI Waste Sys. of North America*, 257 F.3d 766, 770 (8th Cir. 2001).) Moreover, "there is no explanation in the record 'to warrant a reasonable juror's concluding that, assuming the truth of, or [the Plaintiff's] good faith belief in, the earlier statement, [he] could nonetheless perform the essential functions of [his] job.'" (ECF No. 41 at 21 (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802, 807 (1999).) The court agrees.

The court observes that "[t]he plaintiff bears the burden of showing that he can perform the essential functions of the job and is, therefore, qualified . . . [t]hus, to bring any of his claims, [Plaintiff] must show that he is a qualified individual under the [ADA]." (ECF No. 41 at 15 (citing *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995)).) Simply put, Plaintiff's status as a qualified individual depends on whether he: (1) has a disability;[3] (2) is otherwise qualified for the employment; and (3) was excluded from the employment due to discrimination solely based on his disability. *See EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000). The ADA defines a "qualified individual" as:

> [A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8) (2009).

The record includes the essential functions of a corrections officer at the Detention Center.

---

[3] The ADA defines a "disability," with respect to an individual, as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102 (2009). The issue of Plaintiff's disability is not in dispute.

For example, a "terms of employment" form indicates that Plaintiff as a "full-time employee" that is subject to the following schedule:

> Normal Hours of Work: Law Enforcement Detention Center: The department operates seven days per week, twenty-four hours per day. Full time employees are normally scheduled to work rotating shifts twelve (12) hours each and may work five to seven days per week, depending on the needs of the department. **All employees are subject to working other hours and days as needed.**"

(ECF No. 24-3 at 2.)

Here, Plaintiff worked 12-hour shifts in the control room or inmate dormitory and was responsible for the care, custody, and transport of inmates. (*Id.* at 15.) In general, Plaintiff's duties included monitoring day-to-day activity, controlling door locks as officers moved throughout the Detention Center, conducting security checks, and controlling inmates he transported to off-site appointments. (ECF No. 41 at 2.) Plaintiff testified about his duties when conducting security checks:

> Q: When you were stationed in the dorms, tell me what you would be doing?
>
> A: Monitoring the inmates, making sure that nothing got out of hand as far as the inmates were concerned. It could be laundry, could be meals, could be the mail. Things of that sort. Just their day to day, monitoring their day-to-day activities.

(ECF No. 24-5 at 17.)

Plaintiff's explained his duty to care for the inmates:

> Q: How about medical events, do you recall medical emergencies where an inmate would go into some kind of medical distress and an officer would have to respond to get the inmate out or get treatment?
>
> A: I recall an incident where an inmate, just prior to shift change, I believe, fell out of one of the bunks, and so between the shit [sic] that was there and us coming along, attended to that situation.
>
> Q: Did that inmate wind up needing treatment off site?
>
> A: Yes. I believe he was transported to a medical facility.

(ECF No. 24-5 at 28.)

Plaintiff testified that his duty to transport inmates also required him to keep non-inmates safe:

> Q: Would EMS come back into the actual housing facility if somebody needed that or do you have to bring them out and then EMS takes them?
>
> A: If need be.
>
> Q: So, either way? It just depends on the circumstances?
>
> A: Yes.
>
> Q: Obviously, if EMS is going to come into a secure area, then officers have to secure the area and keep the other inmates from moving about, is that right?
>
> A: Yes, sir . . .

(ECF No. 24-5 at 29.)

Plaintiff testified that fights had occurred in the areas that he patrolled:

> Q: Were there any instances during the time that you were there that you recall where you were called to assist another officer in a dorm to help gain control over inmates or because there was some issue where there was a potential that the officer would need assistance?
>
> A: There was actually – I recall an incident that took place where I was actually working in Intake with an inmate who was being processed in when a code was called to emergency response to one of the housing units. I stayed attending to that inmate . . .

(ECF No. 24-5 at 26-27.)

As to Plaintiff's ability to perform the essential duties mentioned above, the record shows that Plaintiff's health was unstable while employed at the Detention Center. For example, in April 2016, Plaintiff, at the direction of his supervisor, went to the hospital with a blood sugar reading of 478, well-above his normal range of 70-105. (ECF No. 24-8 at 16). Contrary to Plaintiff's claim that his blood sugar spikes were not uncommon and that his supervisor "overreacted," medical

records show that the hospital wanted to admit Plaintiff and only discharged him against medical advice. (*Id.*) Moreover, in May 2016, shortly after his doctor wrote him out of work, Plaintiff returned to the emergency room for chest pain. (ECF No. 24-8 at 24.) Plaintiff testified, "I didn't have a choice" about the hospital admitting him (*Id.* at 89), and that he told medical personal that he "felt jittery and had not slept in two days." (*Id.* at 90.) Defendant claims that "[t]he Emergency Department at Providence was so concerned about Plaintiff's condition that they transferred him by ambulance to Providence's Downtown campus. (ECF No. 24-1 at 4.) Plaintiff's lab results revealed that he continued to suffer from uncontrolled blood sugar. (*Id.* at 27.) Plaintiff testified that in April and May of 2016:

> Q: Would you agree with me that during this time your blood sugar was poorly controlled?
>
> A: My numbers were high.
>
> Q: It should have been lower, correct?
>
> A: Yes.

(ECF No. 24-5 at 89-90.)

In May 2016, Plaintiff returned to the hospital emergency room because of nausea, vomiting, dizziness, and stated that his heart was beating fast. (ECF No. 24-8 at 38.) He was discharged the following day. (*Id.*) In June 2016, a cardiologist at the South Carolina Heart Center noted "[Plaintiff] is currently working as a corrections officer although is having difficulty keeping up with the demands of his occupation." (ECF No. 24-8 at 42.)

Furthermore, Plaintiff claims that he could perform the essential duties of his job "with reasonable accommodations." (ECF No. 43 at 5.) Under Section 12111 of the ADA, "reasonable accommodation" may include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111 (2009).

Here, Plaintiff asserts that Defendant Fairfield County denied his only requested accommodation, i.e., allowing him to park in the handicap parking space. (ECF No. 43 at 4.) Plaintiff "had occasionally parked in the handicap spot . . . when he experienced symptoms of his heart condition." (ECF No. 41 at 7 (citing ECF No. 24-6 at 40).) The Magistrate Judge found that ["Plaintiff] has not argued or shown walking approximately fifteen fewer feet before and after his shift would improve any of his significant functional limitations and allow him to exert himself at the necessary level to perform the routine functions of his job throughout the day." (ECF No. 41 at 19.) The record shows that Plaintiff testified that parking in the handicap spot would: "ensure somebody found him if he had an episode coming into or leaving work; allow him to sit and "make sure he was ok," rather than leave his shift; ensure his vehicle would remain in a safe, secure spot if he did have to leave; and reduce his time in the heat and humidity, thereby reducing some of his symptoms." (ECF No. 24-7 at 30-32, 36-37.) Therefore, the court finds there is insufficient evidence that Plaintiff is a "qualified individual" within the purview of the ADA and that, with or without reasonable accommodation, a reasonable jury would find that he could perform the essential functions of a corrections officer.

B. <u>Plaintiff's Second Objection</u>

As to Plaintiff's second objection, the court finds that the Magistrate Judge did not err in concluding that Plaintiff failed to sufficiently explain his contradicting SSDI application and ADA

claim. After his congestive heart failure diagnosis, Plaintiff applied for an Application Summary for Disability Insurance Benefits. (ECF Nos. 24-8; 41 at 20.) His application notes that "[he] became unable to work because of [his] disabling condition on December 2, 2013" and continued to be disabled when he applied. (ECF No. 24-8 at 50.) In 2014, Plaintiff's "Disability Report," drafted in 2014, indicated that he could no longer perform household chores, only bathed when his wife was in the house for fear of passing out due to dizziness, became very tired while walking or standing, and had a very hard time taking the trash out once a week. (*Id.* at 56.) A 2014 "Function Report" noted that Plaintiff was at risk of a heart attack due to a sudden drop in oxygen levels and that he lived with "extreme fatigue." (*Id.* at 67.) Plaintiff made it clear that he could only walk short distances and that he had to rest for a few minutes afterward. (*Id.* at 72.) However, the Social Security Administration deemed Plaintiff was capable of sedentary work, not disabled. (*Id.* at 82.) In September 2015, Plaintiff appeared before an administrative law judge ("ALJ") and applied for a total disability decision, which he received; the ALJ declared that Plaintiff was disabled as of December 2, 2013. (*Id.* at 84-92.)

The court recognizes that, while a SSDI application and an ADA claim may coexist,[4] an inconsistency between a disability application and a claim to be a "qualified individual" under the ADA could create a genuine issue of material fact. *See, e.g., EEOC v. Greater Baltimore Med. Ctr.,*

---

[4] "The pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim . . . many situations in which a SSDI claim and an ADA claim can comfortably exist side by side." *Cleveland*, 526 U.S. at 797–98. "To begin with, SSDI and the ADA have different statutory purposes. The SSDI program provides monetary benefits for individuals, whereas the ADA is intended to eliminate unwarranted discrimination and create equal opportunity" and "the legal standard used to determine SSDI eligibility is different from that used to determine status as a 'qualified individual' under the ADA. SSA uses a five-step eligibility determination that sometimes grants benefits to individuals who "not only can work, but are working." *E.E.O.C. v. Greater Baltimore Med. Ctr., Inc.*, 477 F. App'x 68, 73 (4th Cir. 2012) (citing *Cleveland*, 526 U.S. at 797–98).

*Inc.,* 477 F. App'x. 68, 71 (4th Cir. 2012). Stated differently, "a statement of inability to work must be read as lacking the qualifier of reasonable accommodation . . . [thus] SSDI application, [plaintiff] was saying, in effect, 'I am unable to work without reasonable accommodation.' This statement is not inconsistent with [his] ADA claim, in which [he] is saying, in effect, 'I am able to work *with reasonable accommodation.*'").[5] *Rossum v. Baltimore Cty., Maryland*, 178 F. Supp. 3d 292, 298 (D. Md. 2016) (citations omitted). However, a plaintiff must still proffer evidence "to warrant a reasonable juror's concluding that . . . [Plaintiff] could nonetheless 'perform the essential functions' of the job "with or without 'reasonable accommodation.'" *Cleveland.*, 526 U.S. at 807 (citations omitted). As mentioned above, Plaintiff fails to proffer evidence that he could perform the essential functions of a corrections officer. Therefore, the court finds that the Magistrate Judge did not err in concluding that Plaintiff failed to sufficiently explain his contradicting SSDI application and ADA claim.

C. Plaintiff's Third Objection

Plaintiff claims that:

> Davis Anderson, [Defendant Fairfield County's] Deputy County Administrator and Chief HR Officer, testified in his deposition that '[Plaintiff] had not been preyed upon or targeted by inmates . . . could perform all aspects of his job' and that 'he was personally unaware of any instances in which [Plaintiff] failed to do his job because of his health issues.'

(ECF No. 43 at 9 (quoting ECF No. 41 at 19 n.6).)

The Magistrate Judge concluded that "[t]hese statements do not amount to a general

---

[5] The Fourth Circuit has explained that because the SSDI and ADA serve different purposes, analyzing "a conflict between a claimant's ADA claim and his SSDI benefits application is therefore not a 'purely factual matter,'" because it is "a conflict between a legal position on the one hand, and on the other a 'context-related legal conclusion'" and "in many cases. . . it is comparing apples and oranges to interpret [the] application for SSDI benefits as presumptive proof of total disability under the ADA."

12

admission that Plaintiff could perform the essential functions of his position." Moreover, "having secured an award of disability benefits on the strength of his assertion that he could no longer perform his job, to create a factual dispute, Plaintiff must do more now than merely contradict his sworn statements to the SSA." (ECF No. 41 at 19 n.6 (citing *Cleveland*, 526 U.S. at 806 (finding a plaintiff 'cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement'); *Lee v. City of Salem, Ind.*, 259 F.3d 667, 675-78 (7th Cir. 2001) (finding plaintiff failed to establish a question of fact with respect to his ability to perform the essential functions of his past work where he offered contradictory statements in his SSDI and ADA filings, rather than reconciling the two claims).)

The court observes that Defendant Fairfield County attached a full copy of Davis Anderson's deposition testimony to their Reply (ECF No. 45-1) presumably in response to the Magistrate Judge's statement that the excepts provided made "it difficult to infer the full context." (ECF No. 41 at 19 n.6.) The relevant section of the deposition testimony is provided verbatim:

> Q: Says right in the middle of that paragraph right below disability, if in the case of a current employee's -- actually I misread it. If in the case of a current employee a disability of any kind is discovered which impairs his ability to perform his job or makes his continuance on the job a danger to himself or others, the following actions may be taken.
>
> A: Um-hum.
>
> Q: And action, there are two options. One is, A, if the disability is correctable, the employee shall be allowed a specified time to have it corrected. So, has this been done for [Plaintiff], to your knowledge?
>
> A: Yes.
>
> Q: How?
>
> A: He was given a fit for duty, and once he was fit for duty, he was placed on his corrective action plan to correct everything.

13

Q: So, at that time, there really shouldn't be any fear in the minds of the detention center or the county that [Plaintiff] was incapable of performing his job?

MS. NEWTON: Object to the form.

BY MR. AHN:

Q: You can answer.

A: Sir?

Q: You can answer it.

A: Yeah, once the fit for duty was -- said he could return to do all aspects of the job, I feel he could have done his job, yes.

Q: And once again, you're not aware of any instance in which [Plaintiff] failed to do his job because of his health issues, right?

A: I know of none, no.

Q: Now, that is option number one. So, it is your position that A had been done, so disability is correctable and [Plaintiff] was allowed a specified time to correct that.

A: Um-hum.

Q: And B, if in the opinion of the examining physician the disability cannot be corrected and the county cannot reasonably accommodate the employee in his current position, the appointing authority shall attempt to place the employee in another position which he can perform satisfactorily.

A: Um-hum.

Q: Has this been done?

A: No. He was able to perform in his current job.

(ECF No. 45-1 at 99-101.)

Here, deposition testimony from Davis Anderson, who did not work in the Detention Center, only establishes that Plaintiff provided a fit-for-duty form stating his ability to work without restrictions in May 2016, not that Defendant Fairfield County knew of Plaintiff's failing health or the statements regarding his health in the SSDI application. *See Cleveland*, 526 U.S. at

806 ("an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, [they] must proffer a sufficient explanation.") Furthermore, Plaintiff's assertion that Davis Anderson's unawareness as to any instances of him failing to detain an inmate is misleading. (ECF No. 43 at 11.) Plaintiff testified at his deposition that he never had to defend himself from an inmate (ECF No. 24-5 at 27-28) and that his condition could cause him to be overcome by an inmate (ECF No. 24-7 at 40-41). A plaintiff cannot create a genuine issue of material fact by contradicting himself. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). Therefore, the court finds that the Magistrate Judge did not err in concluding that Defendant Fairfield County did not generally admit that Plaintiff could perform the essential functions of a corrections officer. (ECF No. 41 at 15.)

## IV. CONCLUSION

For the reasons below, the court **ACCEPTS** the Report and Recommendation (ECF No. 41) and **GRANTS** Defendant Fairfield County, South Carolina's Motion for Summary Judgment (ECF No. 24). Plaintiff's action is dismissed with prejudice.

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

September 30, 2019
Columbia, South Carolina

15